FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

NOV 15 2021

DEPUTY CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 2:21-00008 |
| | ) | |
| v. | ) | |
| | ) | |
| [1] THOMAS K. WEIR | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 1347 |
| [2] CHARLES R. OAKLEY | ) | 18 U.S.C. § 1349 |
| a/k/a "Bobby Oakley" | ) | 21 U.S.C. § 846 |
| | ) | |
| [3] WILLIAM L. DONALDSON | ) | |
| | ) | |
| [4] PAMELA SPIVEY | ) | |

# INDICTMENT

THE GRAND JURY CHARGES:

## **GENERAL ALLEGATIONS**

At all times material to this Indictment:

### **BACKGROUND ON CONTROLLED SUBSTANCES**

1.      The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801, *et seq.*, governed the manufacture, distribution, and dispensing of controlled substances. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.      The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five Schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. Pursuant to the CSA and its implementing regulations:

a. Controlled substances in Schedule II were drugs that had a currently accepted medical use, or a use with severe restrictions, but also had a high potential for abuse, and abuse of the drug could lead to severe psychological or physical dependence. Schedule II drugs included opioids, such as Fentanyl; Oxycodone; Hydrocodone (after October 2014); Hydromorphone; Oxymorphone; Meperidine; Methadone; and Morphine;

b. Controlled substances in Schedule III were drugs that had a currently accepted medical use and had less potential for abuse than the drugs or other substances in Schedules I and II, but abuse of the drug could lead to moderate or low physical dependence or high psychological dependence. Schedule III drugs included Hydrocodone (until October 2014) and buprenorphine;

c. Controlled substances in Schedule IV were drugs that had a currently accepted medical use and had a low potential for abuse relative to controlled substances in Schedule III, but abuse could lead to limited physical dependence or psychological dependence. Schedule IV drugs included muscle relaxers, such as carisoprodol. Schedule IV drugs also included benzodiazepines, which included anti-anxiety medications like alprazolam.

4. Pharmacists, who were authorized to dispense controlled substances by the jurisdiction in which they were licensed, were authorized under the CSA to dispense, or otherwise distribute, controlled substances, and were registered individually or were employed in a pharmacy that was registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.06. The Drug Enforcement Administration ("DEA") assigned a unique license number to the registrant.

5.     Title 21, Code of Federal Regulations, Section 1306.04 provided that doctors and

pharmacists bore responsibility for the proper prescribing and dispensing of controlled substances,

and were subjected to penalties for violations of the CSA. Title 21, Code of Federal Regulations,

Section 1306.04(a) provided:

> A prescription for a controlled substance to be effective must be issued for a
> legitimate medical purpose by an individual practitioner acting in the usual course
> of his professional practice. The responsibility for the proper prescribing and
> dispensing of controlled substances is upon the prescribing practitioner, but a
> corresponding responsibility rests with the pharmacist who fills the prescription.
> An order purporting to be a prescription issued not in the usual course of
> professional treatment or in legitimate and authorized research is not a prescription
> within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the
> person knowingly filling such a purported prescription, as well as the person issuing
> it, shall be subject to the penalties provided for violations of the provisions of law
> relating to controlled substances.

6.     Title 21, Code of Federal Regulations, Section 1306.06 provided that: "[a]

prescription for a controlled substance may only be filled by a pharmacist, acting in the usual

course of his professional practice and either registered individually or employed in a registered

pharmacy, a registered central fill pharmacy, or registered institutional practitioner."

## BACKGROUND ON HEALTH CARE PROGRAMS

7.     The United States Department of Health and Human Services, Centers for Medicare

and Medicaid Services ("CMS"), was an agency of the United States that administered the

Medicare and Medicaid programs. Medicare was a federally funded health insurance program that

provided insurance coverage for persons aged 65 or over and to persons under the age of 65 who

are entitled to benefits due to disability. Medicare was a "health care benefit program" as defined

by Title 18, United States Code, Section 24(b) and a "federal health care program," as defined in

Title 42, United States Code, Section 1320a-7b(f).

8. Medicare is divided into different parts that cover specific services. Medicare Part D covered prescription drugs for Medicare beneficiaries enrolled in a Medicare approved Part D drug plan.

9. Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription. The pharmacy would then submit the prescription claim for reimbursement to the Medicare Part D beneficiary's plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

10. TennCare was Tennessee's Medicaid program and was administered pursuant to Title XIX of the Social Security Act. TennCare served indigent people who could not afford health care insurance and uninsured or uninsurable people. TennCare was also a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).

11. Typically, a TennCare beneficiary enrolled in TennCare would fill their prescription at a pharmacy utilizing their TennCare coverage to pay for the prescription. The pharmacy would submit the prescription claim for reimbursement using the beneficiary's identification number.

12. When billing for prescription drugs a pharmacy dispensed, the pharmacy typically billed Medicare or Medicaid indirectly through third-party administrators, such as pharmacy benefit managers ("PBM"). TennCare's PBM was Magellan Pharmacy Solutions. Third-party administrators required that the pharmacy agreed to be bound by and comply with all applicable State and Federal laws, including those addressing fraud, waste, and abuse. A pharmacy also agreed to be bound by the third-party administrator's rules and regulations, along with the rules

4

and regulations of the health care benefit program. These rules included prohibitions against fraudulent conduct, including offering or paying kickbacks and bribes, soliciting or receiving kickbacks and bribes, and submitting claims for invalid, unlawful, medically unnecessary, and/or otherwise ineligible prescriptions.

13. Medicare and Medicaid and their third-party administrators required pharmacies to collect copayments ("copay"), typically a fixed amount, from patients.

14. Medicare and Medicaid would not pay for controlled substances that were dispensed or distributed by way of invalid, unlawful, medically unnecessary, and/or otherwise ineligible prescriptions.

## THE DEFENDANTS AND RELATED INDIVIDUALS AND ENTITIES

15. Oakley Pharmacy, Inc. d/b/a Dale Hollow Pharmacy ("Dale Hollow Pharmacy"), was a corporation formed and registered under the laws of the State of Tennessee and operated as a retail pharmacy licensed with the Tennessee Board of Pharmacy under License Number 3817. Dale Hollow Pharmacy's principal place of business was at 201 McArthur Avenue, Celina, in Clay County, Tennessee 38551.

16. Beginning in April 2014, **[1] THOMAS K. WEIR** was the majority owner of Dale Hollow Pharmacy.

17. **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** was the minority owner of Dale Hollow Pharmacy, and a manager and pharmacy technician of Dale Hollow Pharmacy.

18. **[3] WILLIAM L. DONALDSON** was the former owner and the former Pharmacist-in-Charge ("PIC") of Dale Hollow Pharmacy, then known as Donaldson Pharmacy.

19. **[3] WILLIAM L. DONALDSON** worked as a patient recruiter for Dale Hollow Pharmacy.

20.     John M. Polston was a pharmacist, licensed by the State of Tennessee, Department of Health, Board of Pharmacy under license number 6655 on November 18, 1985.

21.     From at least April 2014 until February 2019, John M. Polston was the PIC of Dale Hollow Pharmacy.

22.     Individual 1 was an employee at Dale Hollow Pharmacy.

23.     Xpress Pharmacy of Clay County, LLC a/k/a Clay County Xpress Pharmacy, LLC ("Xpress Pharmacy"), was a limited liability company formed and registered under the laws of the State of Tennessee and was a retail pharmacy licensed with the Tennessee Board of Pharmacy under License Number 4868.  Xpress Pharmacy's principal place of business was 651 Brown Street, Celina, in Clay County, Tennessee 38551.

24.     Beginning in October 2015, **[1] THOMAS K. WEIR** was the majority owner of Xpress Pharmacy.

25.     **[4] PAMELA SPIVEY** was a minority co-owner of Xpress Pharmacy and a pharmacy technician.

26.     Michael L. Griffith was a pharmacist and licensed by the State of Tennessee, Department of Health, Board of Pharmacy under license number 34339 on July 16, 2010.

27.     From at least October 2015 until February 2019, Michael L. Griffith was the PIC of Xpress Pharmacy.

28.     Individual 2 was an employee at Dale Hollow Pharmacy and Xpress Pharmacy, and the pharmacy manager for both pharmacies.

29.     Dale Hollow Pharmacy and Xpress Pharmacy were located approximately 200 yards apart from one another in Celina, Tennessee.

30.     Dale Hollow Pharmacy and Xpress Pharmacy accepted cash-paying patients and insurance patients, including public insurance, such as Medicare and Medicaid, by enrolling directly or indirectly in Medicare Part D prescription plans (collectively, "Medicare") and Medicaid plans, such as Tennessee's Medicaid program, TennCare, through its PBM, Magellan Pharmacy Solutions (collectively, "TennCare").

31.     Dale Hollow Pharmacy and Xpress Pharmacy submitted claims for payment for dispensed medications, including controlled substances, to Medicare and Medicaid, directly and indirectly, for reimbursement and payment.

32.     From on or about April 2014 until February 2019, Dale Hollow Pharmacy distributed and dispensed controlled substances under DEA Certificate of Registration Number FD2546197.

33.     From at least October 2015 until February 2019, Xpress Pharmacy distributed and dispensed controlled substances under its DEA Certificate of Registration Number FC2576796.

34.     Patient 1 was a TennCare beneficiary and a patient at Xpress Pharmacy.

35.     Patient 2 was a Medicare beneficiary and a patient at Xpress Pharmacy.

36.     Patient 3 was a Medicare beneficiary and a patient of Dale Hollow Pharmacy.

37.     Patient 4 was a Medicare beneficiary and a patient at Dale Hollow Pharmacy, and at Xpress Pharmacy.

## COUNT ONE

THE GRAND JURY FURTHER CHARGES:

38.     Paragraphs 1 through 37 are re-alleged and incorporated by reference as though fully set forth herein.

7

39.     From in or about April 2014 through on or about February 7, 2019, in the Middle District of Tennessee, and elsewhere, **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON**, and **[4] PAMELA SPIVEY** did combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to knowingly and intentionally and without lawful authority distribute and dispense and cause to be distributed and dispensed a mixture and substance containing a detectable amount of the following controlled substances, not for a legitimate medical purpose and outside the usual course of professional practice: (1) oxycodone, hydrocodone, and morphine, all Schedule II controlled substances; (2) buprenorphine, a Schedule III controlled substance; and (3) carisoprodol and benzodiazepines, both Schedule IV controlled substances, in violation Title 21, United States Code, Section 841(a)(1).

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO

THE GRAND JURY FURTHER CHARGES:

40.     Paragraphs 1 through 39 are re-alleged and incorporated by reference as though fully set forth herein.

41.     From in or about April 2014 through on or about February 7, 2019, in the Middle District of Tennessee, **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON**, and **[4] PAMELA SPIVEY** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare

and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Sections 1347 and 2.

42. It was the purpose of the conspiracy for **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON,** and **[4] PAMELA SPIVEY**, and their co-conspirators to unlawfully enrich themselves by, among other things:

      a. submitting, or causing to be submitted, materially false and fraudulent claims to Medicare and Medicaid, directly or indirectly, for payment based on claims that were (i) invalid, (ii) medically unnecessary; and/or (ii) ineligible for reimbursement;

      b. concealing, or causing to be concealed, the submission of false and fraudulent claims to Medicare and Medicaid; and

      c. diverting the proceeds of the fraud for the personal use and benefit of themselves and others, and to further the scheme.

## MANNER AND MEANS

43. The manner and means by which **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON,** and **[4] PAMELA SPIVEY**, and others, including John M. Polston and Michael Griffith, sought to accomplish the purpose of the conspiracy included, among other things, the following:

44. Dale Hollow Pharmacy, through **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and others, maintained enrollment in Medicare Part D plans and Medicaid, including TennCare, and certified that Dale Hollow Pharmacy would comply with all Medicare and Medicaid rules and regulations, and federal laws, including the federal Anti-

Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that Dale Hollow Pharmacy would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare or Medicaid.

45.     **[3] WILLIAM L. DONALDSON**, at the direction of **[1] THOMAS K. WEIR**, recruited Medicare and Medicaid beneficiaries to Dale Hollow Pharmacy.

46.     **[3] WILLIAM L. DONALDSON**, at a table set up in the retail portion of Dale Hollow Pharmacy, assisted in signing patients up for Medicare Part D or Medicaid prescription benefit plans in order to benefit Dale Hollow Pharmacy.

47.     Xpress Pharmacy, through **[1] THOMAS K. WEIR, [2] PAMELA SPIVEY**, and others, maintained enrollment in Medicare Part D plans and Medicaid, including TennCare, and certified, directly or indirectly, that Xpress Pharmacy would comply with all Medicare and Medicaid rules and regulations, and federal laws, including the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that Xpress Pharmacy would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare or Medicaid.

48.     **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON, [4] PAMELA SPIVEY**, and others, including John M. Polston and Michael Griffith, knew that Medicare and Medicaid, including TennCare, did not pay for dispensed medications that were invalid, not eligible for reimbursement, not provided as represented, and/or were medically unnecessary.

49.     **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON, [4] PAMELA SPIVEY**, and others, including John M. Polston and Michael Griffith, dispensed and distributed, or cause to be dispensed and distributed, controlled substance prescriptions that were invalid, not eligible for reimbursement, not provided

as represented, and/or were medically unnecessary, and submitted, or caused others to submit, claims to Medicare and Medicaid, including TennCare.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS THREE AND FOUR

THE GRAND JURY FURTHER CHARGES:

50.     Paragraphs 1 through 49, above, are re-alleged and incorporated by reference as if fully set forth herein.

51.     On or about the dates set forth in each count below, in the Middle District of Tennessee, **[1] THOMAS K. WEIR** and **[4] PAMELA SPIVEY**, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid.

52.     In furtherance of the scheme **[1] THOMAS K. WEIR** and **[4] PAMELA SPIVEY**, as described below, submitted, or caused to be submitted, false and fraudulent claims to a health care benefit program for medications dispensed by Xpress Pharmacy, representing that the items

or services provided were valid, medically necessary, and otherwise eligible for reimbursement:

| Count | Patient | Dispensed On or About Date | Controlled Substance | Schedule | Claim Control Number | Health Care Benefit Program |
|-------|---------|------------------------|---------------------|----------|---------------------|---------------------|
| THREE | Patient 1 | 11/22/2016 | Oxycodone | II | 000136236 02701-000 | TennCare (Medicaid) |
| FOUR | Patient 2 | 2/2/2017 | Oxycodone | II | 791996770 2024G | Medicare Part D |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS FIVE AND SIX

THE GRAND JURY FURTHER CHARGES:

53.     Paragraphs 1 through 52, above, are re-alleged and incorporated by reference as though fully set forth herein.

54.     On or about the dates set forth in each count below, in the Middle District of Tennessee, **[1] THOMAS K. WEIR** and **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** aided and abetted by others, and aiding and abetting others, known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid.

55.     In furtherance of the scheme **[1] THOMAS K. WEIR** and **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** as described below, submitted, or caused to be submitted, false and fraudulent claims to a health care benefit program for medications dispensed by Dale

Hollow Pharmacy, representing that the items or services provided were valid, medically necessary, and otherwise eligible for reimbursement:

| Count | Patient | Dispensed On or About Date | Controlled Substance | Schedule | Claim Control Number | Health Care Benefit Program |
|-------|---------|------|---------------------|----------|---------------------|------------------------------|
| FIVE | Patient 3 | 5/3/2018 | Oxycodone | II | 181253212 139079999 9110 | Medicare Part D |
| SIX | Patient 3 | 5/3/2018 | Morphine Sulfate | II | 181253207 680176999 9110 | Medicare Part D |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES:

56.     Paragraphs 1 through 55 are re-alleged and incorporated by reference as though fully set forth herein.

57.     From in or about April 2014 through on or about February 7, 2019, in the Middle District of Tennessee, **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON**, and John M. Polston, did knowingly combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury: to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs, and to commit certain offenses against the United States, that is:

a.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) and (B), by knowingly and willfully soliciting and receiving remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind, in

13

return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicaid, and in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid; and

      b.     to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A) and (B), by knowingly and willfully offering and paying remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part a Federal health care program, that is, Medicare and Medicaid, and to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid.

## **PURPOSE OF THE CONSPIRACY**

58.    It was a purpose of the conspiracy for **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON**, and others, including John M. Polston, to unlawfully enrich and benefit themselves by:

      a.     offering, paying, soliciting, and receiving kickbacks and bribes in return for recruiting and referring or arranging referrals of Medicare and Medicaid beneficiaries to Dale Hollow Pharmacy to fill their prescription medication orders;

b.     submitting, and causing to be submitted, claims to Medicare and Medicaid for prescriptions procured through kickbacks and bribes;

c.     concealing the kickbacks and bribes and the submission of false and fraudulent claims to Medicare and Medicaid; and

d.     diverting proceeds of the fraud for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**MANNER AND MEANS**

59.     The manner and means by which **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON** and John M. Polston, and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

60.     Dale Hollow Pharmacy was enrolled in Medicare Part D prescription plans and Medicaid, including TennCare, and certified, through the co-conspirators, that Dale Hollow Pharmacy would follow all Medicare and Medicaid rules and regulations, and federal laws, including that Dale Hollow Pharmacy would refrain from violating the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibited the knowing and willful payment of kickbacks or bribes to induce or reward patient referrals involving any item or service payable by federal health care programs, and that Dale Hollow Pharmacy would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare or Medicaid.

61.     **[1] THOMAS K. WEIR** and **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** with the knowledge of John M. Polston and others, offered, paid, and caused to be offered and paid kickbacks and bribes to **[3] WILLIAM L. DONALDSON** to induce **[3] WILLIAM L. DONALDSON** to refer and arrange for the referral of patients to Dale Hollow

15

Pharmacy who were also Medicare and Medicaid beneficiaries and who used their Medicare and Medicaid insurance benefits, directly or indirectly through third-party administrators, to pay for prescriptions at Dale Hollow Pharmacy.

62.     **[3] WILLIAM L. DONALDSON** solicited, accepted, and caused to be accepted kickbacks and bribes from **[1] THOMAS K. WEIR** and **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and others known and unknown to the Grand Jury, in return for referring and arranging for referrals of Medicare and Medicaid beneficiaries to Dale Hollow Pharmacy.

63.     **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and others, including John M. Polston, allowed **[3] WILLIAM L. DONALDSON** to assist patients at Dale Hollow Pharmacy in enrolling in Medicare or Medicaid prescription drug plans, including from a desk set up for **[3] WILLIAM L. DONALDSON** in the retail area of Dale Hollow Pharmacy.

64.     **[3] WILLIAM L. DONALDSON** repeatedly threatened others, including John M. Polston, that he would take his recruited patients away from Dale Hollow Pharmacy if he was not paid.

65.     **[1] THOMAS K. WEIR** and **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** knew that John M. Polston continued to fill prescriptions and knew claims were submitted for those prescriptions to Medicare and Medicaid even though **[3] WILLIAM L. DONALDSON** had been paid an illegal kickback in return for referring that prescription to the pharmacy.

66.     **[3] WILLIAM L. DONALDSON** recruited and controlled between 50% and 90% of the patients who routinely filled prescriptions at Dale Hollow Pharmacy.  **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and others, including John M.

Polston, knew of and facilitated the payment of illegal kickbacks to **[3] WILLIAM L. DONALDSON** and continued to cause claims to be submitted to Medicare and Medicaid despite knowing that most of the patients Dale Hollow Pharmacy provided services to had been referred by **[3] WILLIAM L. DONALDSON** in return for a kickback.

67. **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and others, including John M. Polston, allowed **[3] WILLIAM L. DONALDSON** to influence the dispensing of controlled substances prescriptions.

68. **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** **[3] WILLIAM L. DONALDSON**, and others known and unknown to the Grand Jury, including John M. Polston, dispensed or caused to be dispensed, prescriptions for controlled substances for patients, including those recruited by **[3] WILLIAM L. DONALDSON**, despite obvious signs of abuse or diversion by the patients.

69. Beginning in and around December 2016, **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and John M. Polston took measures to conceal **[3] WILLIAM L. DONALDSON's** continued recruitment of patients on behalf of Dale Hollow Pharmacy.

70. From in or about at least June 2017 until approximately in or about February 2019, in order to conceal the payment of kickbacks and bribes to **[3] WILLIAM L. DONALDSON**, **[1] THOMAS K. WEIR** personally, and through his co-conspirators, paid **[3] WILLIAM L. DONALDSON** in cash, including directing Individual 1 and Individual 2 to provide **[3] WILLIAM L. DONALDSON** with cash in an envelope and cash that was taken out of the Dale Hollow Pharmacy cash register.

71.     In or about November 2017, in order to conceal the payment of kickbacks and bribes to **[3] WILLIAM L. DONALDSON, [1] THOMAS K. WEIR,** purchased a house, cabin, and land from **[2] CHARLES R. OAKLEY** for **[3] WILLIAM L. DONALDSON,** and put the deed in the name of a co-conspirator.

72.     From in or about at least June 2017 until approximately in or about January 2019, **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and others, with the knowledge of John M. Polston, paid cash or otherwise conferred benefits and bribes in the amount of at least $50,000 to **[3] WILLIAM L. DONALDSON** in exchange for **[3] WILLIAM L. DONALDSON's** recruitment of patients to Dale Hollow Pharmacy, including Medicare and Medicaid beneficiaries.

73.     **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and **[3] WILLIAM L. DONALDSON,** with the knowledge of John M. Polston, developed a form of currency for use at Dale Hollow Pharmacy called "Monkey Bucks" and provided it to patients, including Medicare and Medicaid beneficiaries, and allowed the "Monkey Bucks" to be used as cash at the pharmacy.

74.     **[3] WILLIAM L. DONALDSON** paid patient prescription copays for Medicare and Medicaid beneficiaries to encourage them to keep their prescriptions at Dale Hollow Pharmacy.

75.     **[1] THOMAS K. WEIR** and his co-conspirators paid, or directed his employees to pay, Medicare and Medicaid beneficiaries cash to induce them to fill expensive prescriptions at Dale Hollow Pharmacy.  **[1] THOMAS K. WEIR** and his co-conspirators, through Dale Hollow Pharmacy, then obtained reimbursement from Medicare and Medicaid for prescriptions procured through paying kickbacks to Medicare and Medicaid beneficiaries.

76. Dale Hollow Pharmacy employees, at the direction of **[1] THOMAS K. WEIR**, paid Medicare beneficiary Patient 4 $100 in cash when Patient 4 filled Patient 4's mysoline prescription at Dale Hollow Pharmacy. During the course of the conspiracy, Medicare paid Dale Hollow Pharmacy $237,558 for Patient 4's prescriptions dispensed by Dale Hollow Pharmacy and billed by Dale Hollow Pharmacy to Medicare Part D plans.

77. Medicare and TennCare paid Dale Hollow Pharmacy approximately $7.4 million in reimbursements based on patients and prescriptions procured through kickbacks and bribes.

## OVERT ACTS

78. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed in the Middle District of Tennessee, at least one of the following overt acts, among others:

    a. In or around June 2015, **[1] THOMAS K. WEIR** purchased a vehicle for $19,072.18 for **[3] WILLIAM L. DONALDSON's** personal use and for **[3] WILLIAM L. DONALDSON** to use to transport recruited patients to doctor appointments to obtain prescriptions, including controlled substances, and then return with the patients to fill the prescriptions at Dale Hollow Pharmacy.

    b. In or around January 2018, **[1] THOMAS K. WEIR** transferred ownership of the vehicle to **[3] WILLIAM L. DONALDSON** for $500.

    c. In or around January 2017, **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and other co-conspirators removed **[3] WILLIAM L. DONALDSON** from Dale Hollow Pharmacy's payroll and stopped reporting **[3] WILLIAM L. DONALDSON** as an employee even though **[3] WILLIAM L.**

**DONALDSON** continued to act on behalf of Dale Hollow Pharmacy and in furtherance of the conspiracy.

d.  On or about March 9, 2017, **[1] THOMAS K. WEIR** paid **[3] WILLIAM L. DONALDSON** $2,880 via check number 2877 from the Oakley Pharmacy, Inc. d/b/a Dale Hollow Pharmacy bank account number 5237 at Bank of Celina.

e.  From in or around June 2017 and continuing through in or about February 2019, **[1] THOMAS K. WEIR** paid, or directed others to pay, **[3] WILLIAM L. DONALDSON** between $300 to $500 a week in cash kickbacks for acts he took on behalf of Dale Hollow Pharmacy and in furtherance of this conspiracy.

f.  On August 17, 2018, **[3] WILLIAM L. DONALDSON** sent a text message to John M. Polston telling John M. Polston to fill prescriptions.

g.  On or about August 28, 2018, Dale Hollow Pharmacy submitted a claim to a Medicare Part D plan for mysoline dispensed to Patient 4. Based on that claim, Medicare paid Dale Hollow Pharmacy approximately $4,000.

h.  On or about September 1, 2018, Individual 1, an employee of Dale Hollow Pharmacy, sent a text to John M. Polston and stated that Medicare beneficiary Patient 4's sister was in the pharmacy looking for Patient 4's "payout."

i.  On or about September 7, 2018, **[3] WILLIAM L. DONALDSON** sent a text message to John M. Polston telling him to fill an opioid prescription for a patient.

j.  On or about January 13, 2019, **[3] WILLIAM L. DONALDSON** sent a text message to John M. Polston and Individual 2, the pharmacy manager of Dale Hollow Pharmacy, telling John M. Polston and Individual 2 to fill prescriptions and discussing **[3]**

**WILLIAM L. DONALDSON** paying patient copays to give patients an incentive to fill prescriptions at Dale Hollow Pharmacy.

  k. On or about January 13, 2019, Individual 2 sent a text message to John M. Polston and **[3] WILLIAM L. DONALDSON** discussing **[1] THOMAS K. WEIR** paying **[3] WILLIAM L. DONALDSON** for his work for Dale Hollow Pharmacy.

  l. On or about January 18, 2019, **[3] WILLIAM L. DONALDSON** sent a text message to **[1] THOMAS K. WEIR** and John M. Polston discussing how much money **[3] WILLIAM L. DONALDSON's** Dale Hollow Pharmacy customers would give **[3] WILLIAM L. DONALDSON**.

All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATIONS

THE GRAND JURY FURTHER CHARGES:

  79. The allegations contained in the Indictment are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture allegation.

  80. Upon conviction of Count One (Conspiracy to Distribute a Controlled Substance), **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON**, and **[4] PAMELA SPIVEY** shall forfeit to the United States of America, pursuant to Title 21, United States Code, Section 853,

  a. any property constituting, or derived from, any proceeds the defendant(s) obtained, directly or indirectly, as a result of the offense,; and

  b. any of the defendant(s) property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense.

including but not limited to a money judgment in an amount to be determined, representing the amount of proceeds **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley," [3] WILLIAM L. DONALDSON**, and **[4] PAMELA SPIVEY** obtained, directly or indirectly, as a result of such offense and the value of any property used or intended to be used to commit or facilitate the commission of such offense.

81. Upon conviction of Count Two (Conspiracy to Commit Health Care Fraud), **[1] THOMAS K. WEIR, [2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and **[3] WILLIAM L. DONALDSON** and **[4] PAMELA SPIVEY** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of Title 18, United States Code, Section 1347 or a conspiracy to commit such offense, including but not limited to a money judgment in an amount to be determined representing the value of property subject to forfeiture.

82. Upon conviction of Count Three or Four (Health Care Fraud), **[1] THOMAS K. WEIR** and **[4] PAMELA SPIVEY** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to a money judgment in an amount to be determined representing the value of property subject to forfeiture.

83. Upon conviction of Count Five or Six (Health Care Fraud), **[1] THOMAS K. WEIR** and **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to

22

the commission of the offense, including but not limited to a money judgment in an amount to be determined representing the value of property subject to forfeiture.

84.     Upon conviction of Count Seven (Conspiracy to Defraud the United States or to Commit an Offense Against the United States), **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** and **[3] WILLIAM L. DONALDSON** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(c) by Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Title 42, United States Code, Section 1320a-7b(b) or a conspiracy to commit such offense, including but not limited to a money judgment in an amount to be determined representing the value of property subject to forfeiture.

85.     If any of the above-described forfeitable property, as a result of any act or omission of **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby Oakley,"** **[3] WILLIAM L. DONALDSON**, or **[4] PAMELA SPIVEY**:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of **[1] THOMAS K. WEIR**, **[2] CHARLES R. OAKLEY, a/k/a "Bobby**

Oakley," [3] **WILLIAM L. DONALDSON**, or [4] **PAMELA SPIVEY** up the value of said

property listed above as subject to forfeiture.

A TRUE BILL



FOREPERSON

MARK H. WILDASIN
ACTING UNITED STATES ATTORNEY

SARAH K. BOGNI
AMANDA J. KLOPF
ASSISTANT UNITED STATES ATTORNEYS